UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAM S. SMITH, JR.,

                                Plaintiff,          12-CV-1098(MAT)

            v.                                      **DECISION**
                                                    **and ORDER**
CAROLYN W. COLVIN, Commissioner
of Social Security,[1]

                                Defendant.
_____

## INTRODUCTION

        William S. Smith, Jr., ("Plaintiff"), who is represented by
counsel, brings this action pursuant to the Social Security Act
("the Act"), seeking review of the final decision of the
Commissioner of Social Security ("the Commissioner") denying his
applications for Supplemental Security Income ("SSI") and
Disability Insurance Benefits ("DIB"). This Court has jurisdiction
over the matter pursuant to 42 U.S.C. § 405(g). Presently before
the Court are the parties' motions for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.
Dkt. ##9, 10.

## BACKGROUND

        Plaintiff protectively filed applications for SSI and DIB on
April 14, 2009, alleging disability beginning December 14, 2006 due
to spinal impairments affecting the cervical, thoracic, and lumbar

_____

        [1] Carolyn M. Colvin is automatically substituted for the
previously named Defendant Michael Astrue pursuant to Fed.R.Civ.P.
25(d). The Clerk of the Court is requested to amend the caption
accordingly.

regions; obesity; uncontrolled diabetes mellitus; complications from diabetes; and impairments of diabetic etiology including neuropathy. T. 71-84, 104-49. His applications were denied on June 11, 2009, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). T. 85-86.

Plaintiff appeared with counsel before ALJ Robert Harvey in Buffalo, New York on December 7, 2010. T. 36-70. In applying the familiar five-step sequential analysis, as contained in the administrative regulations promulgated by the Social Security Administration ("SSA"), see 20 C.F.R. §§ 404.1520, 416.920; Lynch v. Astrue, No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps), the ALJ found: (1) Plaintiff did not engage in substantial gainful activity since December 14, 2006; (2) he had the severe impairments of discogenic cervical, thoracic, and lumbar spine impairments, diabetes mellitus, and obesity; (3) his impairments did not meet or equal the Listings set forth at 20 C.F.R. 404, Subpt. P, Appx. 1, and that he retained the residual functional capacity ("RFC") to lift and carry 10 pounds, sit for 6 hours and stand or walk for 2 hours in an 8-hour work day, with only occasional bending climbing, stooping, squatting, kneeling, balancing, crawling, pushing and pulling with the upper extremities, could not work around unprotected heights or heavy, moving, or dangerous machinery, and could not climb ropes, ladders, or scaffolds; (4) Plaintiff could not perform his past relevant

work; and (5) there was other work that existed in significant numbers in the national economy that Plaintiff could perform. T. 27-31.

The ALJ's decision that Plaintiff was not disabled under the Act was issued on January 10, 2011, and became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on September 4, 2012. T. 1-6. This action followed. Dkt.#1.

The Commissioner now moves for judgment on the pleadings asserting that substantial evidence supports the ALJ's decision that Plaintiff was not disabled during the period at issue. Comm'r Mem. (Dkt.#9-1) 20-24.

Plaintiff has filed a cross-motion alleging that: (1) Plaintiff's spinal impairments met or medically equaled Listing 1.04A; (2) the ALJ failed to review the opinion of Plaintiff's treating physician; and (3) the ALJ was required to obtain vocational expert testimony at step five of the sequential evaluation. Pl. Mem. (Dkt. #11) 18-25.

**DISCUSSION**

I.   **Scope of Review**

A federal court should set aside an ALJ decision to deny disability benefits only where it is based on legal error or is not supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). "Substantial evidence means such relevant

3

evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted).

## II.  **Relevant Medical Evidence**

### A.  **Treating Sources**

Plaintiff attended the Veteran's Healthcare Administration ("VHA") for primary health care related to diabetes, back pain, and other various ailments from 2007 through 2010. T. 207-326, 354-61. Plaintiff was counseled on his diet and management of his diabetes at nearly every visit, and his diabetes was continuously noted to be poorly controlled. T. 243-44, 254, 261, 291, 300, 416, 430-31, 465. Lab work during this time period revealed abnormal findings, including elevated triglycerides, glucose, microalbumin/creatinine ratio, and A1C. T. 217-28, 240-41, 393-407.

On May 29, 2007, he reported that his blood sugar was between 290 and 300, he ate a lot of junk food, and weighed 221 pounds. Plaintiff's physical and mental examinations were unremarkable, and Dr. Shirpa Simlote diagnosed Plaintiff with uncontrolled diabetes mellitus. Although Plaintiff was advised to monitor his diet and lose weight, he refused diabetes education and weight management program referral. T. 321, 325. Dr. Simolte adjusted Plaintiff's insulin dosage and prescribed lisinopril for hypertension. T. 321.

The following month, Plaintiff was prescribed metformin, and was advised to monitor his diet and exercise as tolerated. T. 322.

Dr. Simlote noted that Plaintiff reported low back strain with no injury, and prescribed warm compresses and Tylenol. T. 323.

Plaintiff's diabetes medications were reviewed and adjusted periodically. T. 315-16, 322, 325, 358-86.

On September 19, 2007, Dr. Simlote noted abnormal glucose lab work. T. 323.

On October 1, 2007, Plaintiff complained of low back pain and numbness in his left thigh for 4-5 years, and left ankle pain. T. 310-15. Physical examination revealed a positive straight leg raise test, but otherwise essentially unchanged. T. 312-13. Dr. Simlote assessed low back pain and left ankle pain and referred Plaintiff for x-rays. She prescribed Tylenol and capsaicin cream. T. 313. Due to elevated creatine phosphokinase, Dr. Simlote advised Plaintiff to avoid vigorous exercise. Id.

On August 7, 2008, Plaintiff rated his pain at 4/10, which improved with rest and heat. T. 300. He denied left lower extremity weakness and told the attending physician that he did not go for the previously ordered x-ray. Id. Treatment notes indicate that Plaintiff had poor insight and motivation. Id. Physical examination revealed no deformity or spinal or paravertebral tenderness, and straight leg raising was limited on both sides. T. 303. Plaintiff was prescribed baclofen, Lortab, and gabapentin for left foot neuropathy, and an x-ray was ordered, but he refused

5

electromyograph ("EMG") and nerve conduction velocity testing. T. 304.

In October, 2008, a back examination was unremarkable, and Plaintiff was prescribed Lortab and trazodone. A magnetic resonance imaging test ("MRI") was recommended to evaluate myelopathy due to progressive pain and some weakness in the left lower extremity. T. 291. His insulin dosage was increased. T. 291.

A motor examination on December 2, 2008 revealed no weakness or wasting of the extremities, and musculoskeletal examination was within normal limits. T. 275-76.

Plaintiff presented for diabetes follow-up and complaints of mild right thumb pain on March 4, 2009. T. 249-65. Examination showed normal gait, no motor weakness, positive straight leg raising, no spinal or paravertebral tenderness, normal heel-toe walking and ankle dorsiflexion and plantar flexion, and mental status within normal limits. T. 259-60. With regard to his right hand and thumb pain, Plaintiff was assessed with superficial branch of radial nerve and was prescribed a brace, rest, trazadone, Mobic, and trolamine. T. 261.

On March 19, 2009, Dr. David Hallasey completed a temporary handicap parking form at Plaintiff's request based on the diagnoses of lumbar radiculitis and diabetic neuropathy. T. 232-47. Examination revealed normal gait, no motor weakness, straight leg raising to 45 degrees on the left, and musculoskeletal examination

6

within normal limits. T. 242-43. Plaintiff was continued on Lortab for back pain, Tegretol and trazadone for left foot neuropathy, and increased insulin. T. 243-44. June, 2009 examination results were unchanged, except for negative straight leg raising. T. 476-77. Plaintiff complained of dull, intermittent pain in the left lower back extending down his left leg in the S1 dermatomal pattern consistent with the November, 2008 MRI. T. 471.

VHA notes dated August 3, 2009 indicated no spinal tenderness, no weakness or wasting of the extremities, and normal gait upon examination. T. 456-58. Achilles deep tendon reflexes were 2+ on the right and 2 on the left, and straight leg raise was 60 degrees on the left. Musculoskeletal examination was grossly intact. T. 456-58. Lortab, increased insulin, and increased Tegretol for back pain and left foot neuropathy were prescribed. T. 458.

Plaintiff demonstrated asymmetrical deep tendon reflexes in the upper extremities, negative straight leg raising, and normal gait on December 7, 2009. T, 440-42. An MRI was recommended for upper extremity radicular symptoms. T. 443.

In April, 2010, Plaintiff's lumbar radiculopathy and burning symptoms in his feet were improved with Tegretol and exercises. T. 416. Examination revealed pain at the end range of cervical spine range of motion, straight leg raising to 45 degrees bilaterally, decreased deep tendon reflexes in the right lower extremity. T. 418-19. Musculoskeletal examination was and grossly

7

intact. Id. Plaintiff was advised to lose weight and was prescribed physical therapy and medications. T. 420. A lumbar brace was also considered. Id.

Plaintiff requested a back brace on April 9, 2010, and received a cane on May 19, 2010. T. 412-13.

Follow-up treatment notes from August 9, 2010 indicated that Plaintiff reported eating boxes of Little Debbie snack cakes at one time, yet could not understand why his sugars were high. T. 408. He requested more Lortab for his back, and told the R.N. that he had no money, had 15 cats to feed, was on welfare, and would do anything for money. He was applying for disability through a California company because the Niagara Falls office could not help him. Id. Plaintiff's pain assessment was reported as 0. Id. Examination revealed that he walked quickly with no limp or gait disturbance, no spinal or paraspinal tenderness, and straight leg raising was negative. T. 409-10. The R.N. noted that Plaintiff was "not interested in losing weight," and didn't understand his diabetes. T. 410. He was advised on dietary modification, exercise, and glucose monitoring. Id. The nurse did not believe Plaintiff required Lortab, as it would blunt any neuropathy he would get from diabetes. Id. Additionally, his toxicity screen was negative. Id.

### B.  Medical Source Statement

VHA physician Dr. Hallasey completed a Medical Source Statement on May 7, 2010, in which he diagnosed Plaintiff with

lumbar herniated discs with associated radiculopathies to the left lower extremities (L4-5, L5-S1); cervical herniated discs (C4-5, C5-6, C6-7) and foraminal impingement; thoracic spondylosis; diabetes mellitus; degenerative joint disease; gastroesophageal reflux disease; and chronic parasinusitus. T. 350-53. Symptoms were listed as severe left radicular pain ranging from 4-6/10, eccentric to the lower left extremity, and decreased left lower extremity strength, weakness, and falls. T. 350. Plaintiff's pain was unable to be relieved with medication. Id.

With regard to Plaintiff's residual functional capacity, Dr. Hallasey reported that Plaintiff could sit and stand/walk for 0-2 hours per work day, he should not continuously sit in a work setting, and could not sit for more than 20 or 30 minutes without pain. T. 351. He was further restricted in lifting/carrying under 10 pounds and was significantly limited in repetitive reaching, handling, fingering, and lifting. Id. Plaintiff required the use of a cane and lumbar brace while standing or walking, and could not stoop, push, kneel, pull, or bend, and needed to avoid heights. Id.

Dr. Hallasey opined that Plaintiff would be capable of moderate work stress, but would be further limited by anxiety due to medical conditions, and would be absent from work more than 3 times per month. T. 352-53. An EMG was scheduled due to weakness, and surgery was not recommended. T. 352-53.

C.    Diagnostic Imaging Tests

X-rays of Plaintiff's mandible, chest, and lumbrosacral spine dated August 11, 2008, were unremarkable. T. 231-16, 389-91.

A November 6, 2008 MRI of the lumbar spine revealed minimal indentation of the thecal sac at L4-5 by a small broad base disc herniation; small left paracentral disc herniation at L5-S1 which extended into anterior epidural space but did not compress the thecal sac; and a herniated disc touching the left S1 nerve root. T. 208-09, 280, 340-41, 347, 386. Dr. Hallasey noted that the MRI showing a herniated disc at L5-S1 eccentric to the left was consistent with Plaintiff's complaints of left foot and leg pain, and recommended medication and lifestyle changes. T. 278-82.

A subsequent MRI study dated January 28, 2010 of Plaintiff's cervical spine showed small left paracentral disc protrusion at C4-C5 with compression of the thecal sac, touching the ventral surface of the cord; mild diffuse protrusion disc at C5-C6 associated with mild spinal stenosis, touching the ventral surface of the cord; small broad-based protrusion of disc at C6-C7; and mild narrowing of the left C4-C5 neural foramen. T. 342-43, 432-33.

On February 14, 2010, a thoracic spine MRI revealed small broad-based disc herniation at T9-T10, causing mild thecal sac compression, and no evidence of compression fracture or cord compression. T. 344-45, 431-32.

III. **Non-Medical Evidence**

Plaintiff was 44 years-old on the date of his alleged disability onset and had a high-school education. T. 40, 150, 163-64, 184. He had previously worked as a driver and laborer and served in the U.S. Army for 3 years. T. 40, 51-52, 159-60, 177-82.

At the disability hearing, Plaintiff testified that he had pain that traveled down his legs from either his back or from diabetes-related symptoms. He acknowledged that he was insulin-dependant and his diabetes was not well-controlled. T. 42. He stated that his leg hurt daily, his back pain fluctuated with intensity, and he experienced numbness and tingling in his left thigh, left ankle, and in both feet. T. 43, 62. Plaintiff further reported daily muscle spasms in the left elbow, muscle cramping in both legs, weakness in his arms, lumbar weakness, blurred vision, dizziness, and fatigue. He stated that some of these symptoms may have been side effects from medication. T. 45-46.

Plaintiff's blood sugars averaged 350, and had gone as high as 732, but he had not lost consciousness and did not know why. T. 46.

He also testified that he had herniated discs in his cervical and thoracic spinal regions, but his treating physician did not recommend back surgery because of its long-term failure rate. T. 47. Plaintiff had constant neck pain, sharp mid-back pain, and pain that radiated to his shoulders, arms, and hands. T. 48.

With regard to his daily activities, Plaintiff testified that
he had trouble bending to put his shoes on, had pain during
showering, could lift a gallon of milk but not a 20-pound bag of
potatoes. He could walk 1-2 blocks, stand for 30 minutes and sit
for 20-30 minutes. He could not reach overhead, push, pull, squat,
bend at the waist, or climb. T. 56. Chores such as vacuuming
required breaks, and he had pain with most activity. T. 64-65.
Medications were trazodone and hydrocodone. T. 57. He tried to
remain in a comfortable position to reduce his pain. T. 58. He
cooked, went to appointments, visited with friends, performed basic
hygiene, occasionally cleaned, and watched television, but most
activities presented him with some level of pain. T. 167-71.
Plaintiff took care of his cats, although his daughter purchased
cat food and kitty litter for him. T. 50, 167.

## IV. __The decision of the Commissioner was supported by substantial evidence.__

### A.  Listings Analysis

Plaintiff first argues that his spinal impairments met or
medically equaled the criteria for Listing 1.04A, and therefore a
finding of disabled was appropriate at step three of the sequential
evaluation. Pl. Mem. 18-20.

To be considered disabled under Listing 1.04A, a plaintiff
must demonstrate evidence of a disorder of the spine that results
in the compromise of a nerve root or the spinal cord with evidence
of nerve root compression. See 20 C.F.R. Pt. 404, Subpt. P,

Appx. 1, §§ 1.04, 1.04A. The nerve root compression must be "characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss . . . ." Id., § 1.04A. It is the plaintiff's burden to "demonstrate that [his] disability [meets] 'all of the specified medical criteria' of a spinal disorder." Otts v. Comm'r, 249 Fed. Appx. 887, 888 (2d Cir. 2007) (quoting Sullivan v. Zebley, 493 U.S. 521, 531 (1990)). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan, 493 U.S. at 530 (citation omitted).

In his step three finding, ALJ described the requirements of Listing 1.04, and stated that Plaintiff's spinal impairments did not meet the criteria of the listing on the basis that there was no evidence of significant nerve root or thecal sac compression within the lumbar, cervical, or thoracic spine. T. 28. The ALJ correctly found that Plaintiff's cervical spine disorder did not satisfy the requirements of Listing 1.04A.

Plaintiff's cervical spine MRI revealed small left paracentral disc protrusion at C4-C5 with compression of the thecal sac, touching the ventral service of the cord, and mild narrowing of the left C4-C5 neural foramen. T. 29, 343. Assuming the MRI evidenced a cervical spine disorder resulting in the compromise of a nerve root or spinal cord, additional criteria must still be met. The

treatment notes indicated that on multiple visits, Plaintiff exhibited no weakness or wasting of the extremities, full range of motion in the cervical spine, no spinal tenderness in the neck, and no paravertabral muscle tenderness in the neck. T. 242-43, 258, 274-5, 290, 300, 303, 311-13, 320-21, 418-19, 440-43, 453, 456-57, 476-77. Dr. Hallasey questioned the presence of weakness in Plaintiff's left upper extremity on December 7, 2009, but ordered an MRI of the cervical spine to rule out myelopathy. T. 443. Following a review of that MRI, Dr. Hallasey prescribed conservative treatment in the form of physical therapy. T. 420.

Dr. Hallasey noted decreased reflexes in the upper extremity, decreased cervical range of motion, and painful end-range cervical motion, each on one occasion.[2] T. 342, 419, 442. "Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation. Care must be taken to ascertain that the reported examination findings are consistent with the individual's daily activities." 20 C.F.R Pt. 404, Subpt. P, Appx. 1, 1.00(D). The ALJ properly considered these symptoms in light of the remaining medical evidence and Plaintiff's activities of daily living, and

---

[2] Plaintiff also cites to Dr. Hallasey's May 7, 2010 Medical Source Statement as evidence of decreased strength in the left arm. Pl. Mem. 19. The document actually reflects decreased lower extremity strength. T. 105 (noting "decreased LLE strength, weakness," and "lower back — LLE weakness.")

therefore applied the correct legal standards in the step three analysis. T. 27-30.

Because the record does not establish the requisite evidence of cervical-related limitation in motion, motor loss, or sensory loss so as to meet Listing 1.04A, the ALJ's step three finding was not made in error and was supported by substantial evidence.

### B.    Treating Source Evidence

Plaintiff next contends that the ALJ failed to review the opinion of Dr. Hallasey pursuant to the regulatory factors set forth at 20 C.F.R. §§ 404.1527, 416.927. Pl. Mem. 20-24.

Under the Commissioner's regulations, a treating physician's opinion is entitled to controlling weight, provided that it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2). However, "the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999), citing 20 C.F.R. § 404.1527(d)(4).

A corollary to the treating physician rule is the "good reasons" rule, which provides that the Commissioner "'will always give good reasons in its notice of determination or decision for the weight it gives [plaintiffs's] treating source's opinion.'" Clark v. Comm'r, 143 F.3d 115, 118 (2d Cir. 1998), quoting former

20 C.F.R. §§ 404.15279(d)(2), 416.927(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific.'" Blakely v. Comm'r, 581 F.3d 399, 406 (6th Cir. 2009), quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996).

In his decision, the ALJ afforded Dr. Hallasey's Medical Source Statement "some, but not great weight." T. 29. Noting that Dr. Hallasey was Plaintiff's treating physician, the ALJ went on to explain that the restrictive functional assessment was inconsistent with the objective medical testing and the vast treatment records. T. 30. He further noted that Dr. Hallasey's opinion was based primarily on Plaintiff's subjective complaints of pain, rather than objective evidence of a back impairment. Id. The ALJ observed that despite numerous recommendations for diagnostic testing, Plaintiff refused an EMG and nerve conduction study. Id. Underscoring the ALJ's findings were the most recent VHA treatment notes, which indicated that Plaintiff walked without difficulty, did not complain of back pain, and that his toxicity screen result was negative despite a prescription for Lortab. Id.

Here, it cannot be said from the face of the ALJ's decision that he did not set forth the requisite "good reasons" for partially discrediting Dr. Hallasey's highly restrictive functional assessment.

16

It is for the same reasons that Plaintiff's challenge to the ALJ's application of the treating physician rule must fail. Dr. Hallasey's Medical Source Statement was inconsistent with the balance of the record evidence, which included minimal diagnostic findings, unremarkable physical examination results, and regular activities of daily living such as performing household chores, cooking, grocery shopping, driving a car, and performing self-care, albeit with some limitations. T. 29-30.

Finally, the ALJ was not required to re-contact Dr. Hallasey because there were no gaps in the record during the period in question that would require the ALJ to further develop the record. See Rosa v. Callahan, 168 F.3d 72, 79 & n. 5 (2d Cir. 1999) ("where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim").

For these reasons, the ALJ's application of the treating physician rule was not erroneous, and was supported by substantial evidence in the record.

### C.    Vocational Expert Testimony

Plaintiff avers that the ALJ was required to obtain vocational expert testimony at step five of the sequential evaluation because Plaintiff had significant non-exertional impairments and relied on a cane for ambulation. Pl. Mem. 24-25.

It is well-settled in this Circuit that "[i]f a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)); see also Ketch v. Colvin, 12-CV-1104S, 2014 WL 411875, at *3 (W.D.N.Y. Feb. 3, 2014).

At the outset, Dr. Hallasey's Medical Source Statement upon which Plaintiff relies failed to specify which non-exertional limitations existed that would significantly erode Plaintiff's occupational base. Pl. Mem. 24. The ALJ properly gave partial weight to this report, as it was inconsistent with the treatment notes, diagnostic imaging tests, and the balance of the record. T. 29-30. Moreover, the ALJ's residual functional capacity analysis was supported by substantial evidence, including moderate activities of daily living, multiple physical examinations revealing no spinal tenderness and walking without difficulty or gait disturbance, conservative pain treatment by means of medication and physical therapy, Plaintiff's refusal to undergo diagnostic testing, and his declination of diabetes treatment recommendations, such as diet monitoring and exercise. T. 29-30, 243, 254, 264, 291, 300, 319, 321, 325, 408, 410, 416, 431, 443.

The ALJ correctly proceeded to step five of the sequential analysis and found Plaintiff able to perform work existing in the

national economy. T. 30-31. At this step, the ALJ applied
Rule 201.28 of the Medical-Vocational Guidelines, or the Grids, to
find that based on Plaintiff's residual functional capacity, age,
education, and vocational history, Plaintiff was not disabled.
T. 30-31; see 20 C.F.R. Pt. 404, Subpt. P, Appx. 2. Specifically,
the ALJ determined that Plaintiff was able to perform sedentary
work with additional postural limitations, was considered a younger
individual with a high school education and could communicate in
English. T. 30. Citing SSR 85-15, he found that Plaintiff's non-
exertional limitations (occasional limitations in bending, climb,
stooping, squatting, kneeling, balancing, crawling, pushing, and
pulling) did not significantly erode the occupational base of
sedentary work. T. 31; see SSR 85-15, 1985 WL 56857, at *4-5
(1985); Felder v. Astrue, No. 10-CV-5747, 2012 WL 3993594, at *17
(E.D.N.Y. Sept. 11, 2012)("According to the SSA's rulings, an
inability to bend, stoop, crouch, or kneel more than occasionally
would not substantially affect an individual's ability to perform
light or sedentary work.") (citation omitted). The use of a
vocational expert, therefore, was not required, and the ALJ was
entitled to rely on the Medical-Vocational Guidelines.

In a related argument, Plaintiff appears to assert that the
ALJ failed to consider his need to use a hand-held assistive
device, i.e., a cane, in order to walk. Pl. Mem. 24. SSR 96-9p
states: "[t]o find that a hand-held assistive device is medically

required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7; see also Miller v. Astrue, 538 F.Supp.2d 641, 651 n.4 (S.D.N.Y. 2008) (discussing SSR 96-9p and finding plaintiff's use of cane did not factor into finding her able to perform sedentary work).

The ALJ recognized that Plaintiff appeared at the administrative hearing with a cane, but he did not factor use of a cane into his residual functional capacity assessment, nor did he discuss it in his written decision. T. 59. However, Plaintiff repeatedly demonstrated normal gait, including the examination immediately prior to the issuance of Plaintiff's cane. T. 417 (noting no gait disturbances and no falls within the past 12 months). Other than a notation by Dr. Hallasey that Plaintiff was prone to falls, there is no other evidence in the record that indicates that a cane was medically necessary. T. 105. More importantly, there are no treatment records indicating the reasoning for which Plaintiff required aid in walking or standing and under what circumstances the cane would be utilized. See Miller, 538 F.Supp.2d at 651 n.4 (S.D.N.Y. 2008) ("Even if plaintiff required a cane, there is no evidence she required it at all times,

and 'if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.'").

Plaintiff has failed to establish that his assistive device was "medically required" under the explicit terms of SSR 96-9p. See, e.g., Howze v. Barnhart, 53 Fed. Appx. 218, 222 (3d Cir. 2002) (burden to establish medical necessity rests with claimant). Accordingly, the ALJ did not err by excluding it from his residual functional capacity determination, which was supported by substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt.#9) is granted, and Plaintiff's cross-motion (Dkt.#10) is denied, and the Complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.


S/Michael A. Telesca
_____
MICHAEL A. TELESCA
United States District Judge

Dated:   Rochester, New York
         June 30, 2015

21